Soheila Hosseini, Esq.
State Bar #210384
23276 South Pointe Dr., Suite 218
Laguna Hills, CA. 92653
Phone: (949) 215-7100
FAX:   (949) 215-7171

Attorney for Plaintiff-Petitioner

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| SANG WOONG HAN,           )<br>         Petitioner-Plaintiff    )<br>                                        )<br>    v.                                 )<br>CHAD F. WOLF, Acting Secretary, U.S. )<br>Department of Homeland Security;   )<br>MATTHEW T. ALBENCE, Deputy       )<br>Director and Senior Official Performing )<br>the Duties of the Director, U.S.        )<br>Immigration and Customs Enforcement. )<br>DAVID MARIN, Director of the Los    )<br>Angeles Field Office, Enforcement and )<br>Removal Operations, U.S. Immigration )<br>and Customs Enforcement; and JAMES )<br>JANECKA, Warden, Adelanto ICE      )<br>Processing Center, DAVID GOMEZ, Removal )<br>Officer, Adelanto ICE Processing Center )<br>         Respondents-Defendants.      | Case No: 2:20-CV-4299<br><br>ADELANTO COVID<br><br>PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

1

# INTRODUCTION

1-Petitioner-Plaintiff is held in civil immigration detention at the Adelanto ICE Processing Center ("Adelanto") in the midst of the current COVID-19 pandemic where detainees are kept in crowded cells, are seated next to each other at a common table for eating their meals, they sleep on bunk beds and use common restrooms, with no hand sanitizers or disinfecting materials and no enforced policies to use masks and gloves, masks and disinfecting materials such as hand sanitizers. The only efficient method known to avoid the contagion of COVID-19 virus is to practice social distancing, and for individuals to stay at least six feet apart from one another, which is not being practiced in Adelanto detention center.

2- As of today there are no FDA-approved treatment for COVID-19 or vaccines. The only recognized and recommended method of reducing the risk of infection at this point is practicing hygiene and sanitation and to keep a minimum of 6 feet distance from other individuals, known as "social distancing".

3. On 03/13/2020, Physician and independent medical consultant to the Department of Homeland Security, Dr. Robert Greifinger, with 30 years of experience working in health care for prisoners who have managed the medical care of the inmates in Rikers Island in New York City, and who has authored more than 80 scholarly publications including publications about public health and communicable disease, has determined that "There is no known cure or antiviral treatment for COVID-19 at this time. The only way to mitigate COVID-19 is to use scrupulous hand hygiene and social distancing….. Many immigration detention facilities lack adequate medical care infrastructure to address the spread of infectious disease and treatment of high-risk people in detention…. The only viable public health strategy available is risk mitigation….. , the release of high-risk individuals is a key part of a risk mitigation strategy."

Since social distancing will be both impractical and impossible to keep given the population density in Adelanto detention facility many of the detainees and staff will most likely be contracted with the COVID-19.

**JURISDICTION AND VENUE**

4. Jurisdiction is proper and relief is available pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 5 U.S.C. § 702 (waiver of sovereign immunity), 28 U.S.C. § 2241 (habeas corpus jurisdiction), and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause). This Court has the power in equity to issue declaratory and injunctive relief for violations of the Constitution by federal officials. See Ex Parte Young, 209 U.S. 123 (1907); Philadelphia Co. v. Stimson, 223 U.S. 605, 620 (1912) (applying Ex Parte Young principle to federal government officials); 5 U.S.C.

5. Venue is proper in the Central District of California under 28 U.S.C. § 1391, because at least one federal Defendant resides in this District, the Individual Plaintiff is imprisoned in this District, and a substantial part of the events giving rise to the claims in this action took place in this District. Venue is also proper under 28 U.S.C. § 2243 because the immediate custodians of all the Individual Plaintiffs reside in this District.

**PARTIES**

**Plaintiff:**

6-Plaintiff Sang Woong Han is a 46-year-old citizen of South Korea, who has been a legal permanent resident since 1989. He had appeared to all his immigration hearing since 2012 except for the 01/27/2020 hearing when he was found unconscious due to his illness for high blood pressure. On 01/27/2020 an immigration judge ordered him deported in absentia and he

was subsequently transferred to Adelanto after ICE arrested him.  Plaintiff' deportation order case was later reversed, and his case was reopened on 04/13/2020 when the immigration judge found his illness as a good cause to reopen the case. Plaintiff has been in Adelanto detention facility since February of 2020.

**Defendants:**

7. Defendant Chad F. Wolf is the Acting Secretary for DHS. Pursuant to 8 U.S.C. § 1103(a), he oversees administration of immigration laws with authority over ICE, and its field offices as well as the authority to order the release of the Plaintiff. At all times relevant to this Complaint, Defendant Wolf was acting within the scope and course of his position as the Acting Secretary for DHS. Defendant Wolf is sued in his official capacity.

8. Defendant Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. Defendant Albence is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants. Defendant Albence is a legal custodian of the Plaintiff. At all times relevant to this Complaint, Defendant Albence was acting within the scope and course of his position as an ICE official. He is sued in his official capacity.

9. Defendant David Marin is the Director for the Los Angeles Field Office of Enforcement and Removal Operations ("ERO") within ICE, a federal law enforcement agency within the Department of Homeland Security ("DHS"). ERO is a division of ICE that manages and oversees the immigration detention system. In his capacity as Field Office Director for ERO, Defendant Marin exercises control over and is a custodian of immigration detainees held at Adelanto, including all Plaintiffs in this case. At all times relevant to this Complaint, Defendant Marin was acting within the scope and course of his employment with ICE. He is sued in his official capacity.

10. Defendant James Janecka is Warden of Adelanto in San Bernardino County, where the Plaintiff is detained. Defendant Janecka is the direct, physical custodian of the Plaintiff. At all times relevant to this Complaint, Defendant Janecka was acting within the scope and course of his employment with Adelanto in San Bernardino County. He is sued in his official capacity. He is named in his official capacity.

11-Defendant David Gomez is an Immigration and Customs Enforcement Removal Officer of Adelanto Detention Facility where plaintiff is detained. Defendant is the in charge of plaintiff's immigration related matters. At all times relevant to this Complaint, Defendant Gomez was acting within the scope and course of his employment with Adelanto in San Bernardino County. He is sued in his official capacity.   He is named in his official capacity.

**FACTUAL ALLEGATIONS**

12- Adelanto is in the City of Adelanto and the County of San Bernardino, which are within the Central District of California.  Adelanto is a private, for-profit immigration detention facility operated by Geo Group, Inc. for BICE.

13-According to the United States Centers for Disease Control and Prevention ["CDC"], the coronavirus is spread mainly through person-to-person contact. More specifically, the coronavirus is spread between people who are in close contact – within about 6 feet – with one another through respiratory droplets produced when an infected person coughs or sneezes. The droplets can land in the mouths or noses, or can be inhaled into the lungs, of people who are within about 6 feet of the infected person. Moreover, studies have established that the coronavirus can survive up to three days on various surfaces.

14-COVID-19 is a malady caused by a coronavirus that has reached pandemic status. COVID-19 virus infections can cause death, serious illnesses and infectious diseases ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death in older

patients and patients with chronic underlying conditions. There is no vaccine to prevent COVID-19. There is no known cure or antiviral treatment for COVID-19 currently. The only way to mitigate COVID-19 is to use careful hand hygiene and social distancing.

15-As of May 12, 2020, COVID-19 pandemic has 1.38 million confirmed cases with more than 81,779 deaths people in the United States. In California there are 67,939 confirmed cases with 2770 deaths. In San Bernardino County, where Adelanto is located, the number of confirmed have reached 3015 with 115 deaths.

16-While detained in Adelanto Detention Facility, the Plaintiff was diagnosed by the ICE medical staff as having high blood pressure and High cholesterol and was prescribed medication by ICE medical staff including Gemfibrozil, Lisinopril, Amlodopine. Plaintiff has developed a swollen foot since he has been detained in Adelanto Detention Facility. Some of the medical documents for the Plaintiff reflect that the treatment suggested for the Plaintiff, a male individual, include "Evaluated and provided brochure describing female medical and mental health services related to pregnancy, terminated/miscarried pregnancies, contraception, family planning and age-appropriate gynecological healthcare."

17-The City of Adelanto has declared an Emergency Alert as of March 16, 2020 through their Alert Center and has closed to the public all City offices including City Hall, Adelanto Stadium, Senior and Community Centers. In Adelanto Detention facility attorneys are required to wear goggles in addition to masks and gloves, making it unmanageable to wear glasses where the same requirements do not apply to the employees of the Adelanto Detention Facility as they ingress and egress, without goggles, gloves and some without masks.

18-Many of the ICE Removal Officers work remotely and do not respond to plaintiff's counsel's calls and if they do it would be with a delay of 2 to three weeks.

19-The Center for Disease Control for Correctional Facilities ("CDC") has issued an Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities as follows:

> "…..Adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response. Monitor these recommendations for updates. Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones). Staff should clean shared equipment several times per day and on a conclusion of use basis.

20-The CDC Interim Recommendations for U.S. Community Facilities with Suspected/Confirmed Coronavirus Disease 2019 (COVID-19) for how to clean and disinfect state "If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection."

21-The Adelanto Facility staff do not adhere to the CDC recommendations for cleaning and providing sufficient hand-sanitizer. The tables, seats, countertops, and doorknobs are not cleaned several times a day. The common items are not cleaned with soap and water prior to disinfection. All the staff does is a walk-by spray without wiping the surfaces.

22-At the Adelanto Facility most hand sanitizer stations inside the dorms in the facility where detainees reside are empty. On May 1, 2020 between 2:00 pm to 5:30 pm two hand sanitizer stations attached to the two double doors located at the front entrance of ICE facility, for ingress and egress traffic were empty.

23-OSHA section 1910.1200(e)(1)(i) states "A list of the hazardous chemicals known to be present using a product identifier that is referenced on the appropriate safety data sheet".

There are no printed data sheet or signs bulletin boards to provide a list of the chemicals sprayed by the Adelanto staff for disinfection.

24- Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities state that "The CDC Employers must comply with OSHA's standards on Bloodborne Pathogens (29 CFR 1910.1030external icon), including proper disposal of regulated waste, and PPE (29 CFR 1910.132external icon)."

25-The OSHA standard on Bloodborne Pathogens Section 1910.1030(d)(3)(x) states "Masks, Eye Protection, and Face Shields. Masks in combination with eye protection devices, such as goggles or glasses with solid side shields, or chin-length face shields, shall be worn whenever splashes, spray, spatter, or droplets of blood or other potentially infectious materials may be generated and eye, nose, or mouth contamination can be reasonably anticipated."

26-The Adelanto Facility staff pass out mask to any detainee who wants to use them, but many detainees decline getting the masks and the staff do not obligate them to use the mask. On May 6, 2020 at 2:30 pm in W2-A dorm, no one was wearing a mask, not even the officers present at the facility. In Adelanto Facility the showers are close together, with less than 6 feet apart and no restriction in the use. The restroom at the Facility are commonly used by all with toilets that have no lids or cover.

27-The CDC in their Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities defines "Social Distancing" as follows:

"Social Distancing – Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance

between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication. pdf icon."

28-The CDC Interim Guidelines on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities for review of the exiting flu, all-hazards, and disaster plans, and revise for COVID-19 states "Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity."

29-The recommendation of the CDC to practice social distancing is not practiced with regards to use of phones, tables, seats, and cell rooms. Regarding phones at Adelanto Facility at W2-A housing unit, there are 8 phones stations next to each other to be used by the detainees. At some point the officers put a sign/divider in between the phone making it 3 functional phone and not exactly 6 feet apart.  The signs put up on the phone boots which are not being enforced state as "In accordance with social distancing guidelines and rules this phone is not to be used." After the officers took a picture of that setting, they did not enforce that practice. As a result, the detainees continue making phone calls using all 8 phone boots next to each other with less than one feet apart without any objections from the staff or officers. The signs on the phone are part of a show for Adelanto Facility to reflect compliance with social distancing when they make no efforts for enforcement.

30- The CDC Guidelines on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities for Prevention Practices for Incarcerated/Detained Persons and to implement social distancing states "Implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)…...Rearrange seating in the dining hall so that there is

more space between individuals (e.g., remove every other chair and use only one side of the table) "

31-Regarding the tables and seats at the W2-A housing unit, there are about 18 tables with 4 attached seats. The tables are about 3-4 feet apart with no signs on any tables in between to avoid usage in accordance with the social distancing guidelines. Detainees use all the tables and all the seats with no restrictions. As a result, groups of 4 detainees sit together without social distancing with 4 other groups of four within 3-4 feet apart.

32- The CDC Guidelines on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities for Prevention Practices for Incarcerated/Detained Persons and to practice social distancing in regards to housing states "If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.) Arrange bunks so that individuals sleep head to foot to increase the distance between them Rearrange scheduled movements to minimize mixing of individuals from different housing areas

33-At the Adelanto Facility in the West-wing W2-Alpha or W2-A housing unit, there are 18 cells or rooms. There are 8 cells/rooms on the first floor and 10 cells/rooms on the second floor. Room 101 on the first floor and room 201 on the second floor are 8-man cells, 20 x 14, that are holding 6 detainees each. The 4-man cells, 12 x 10, are holding approximately 3 detainees and the 2-man cells are holding one to two detainees. As of May 6, 2020, 59 detainees are being held in the 18 cells within the W2-A or W2-Alpha dorm. It is impossible to maintain the 6 feet apart social distancing in the housing units as recommended by the CDC guidelines.

34- The Centers for Disease Control and Prevention (CDC) has identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine

disorders, including diabetes, metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy.

35-Individuals with the underlying medical conditions and diseases most vulnerable to COVID-19, are at a higher risk to suffer serious illness and death. Patients who do not die have developed prolonged serious illness requiring hospital care including ventilators and other items of short supply and some may require intensive medical support.

36- Based on publications from American Heart Association, those with high blood pressure and diabetes are more susceptible to coronavirus and more likely to develop more severe symptoms. The data from the outbreak in Wuhan shows a 6% death rate among COVID-19 who also have high blood pressure and 7.3% for those with diabetes.

## LEGAL ARGUMENTS

37. When the Government detains people for violations of immigration law, those people are civil detainees, even if they have a history of criminal convictions. See Zadvydas v. Davis, 533 U.S. 678, 690 (2001). Civil detainees are entitled to more considerate treatment and conditions of confinement than criminals, whose conditions of confinement are designed to punish.

38. Civil detainees cannot be detained in conditions of confinement that constitute punishment. See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982).

39. The constitutional rights of criminal detainees establish a floor, and not a ceiling, for the clearly established constitutional rights of civil detainees. See Smith v. Wash., 781 F. App'x. 595, 597 (9th Cir. 2019).

40. If a condition of confinement would violate the Eighth Amendment pertaining to a criminal detainee, it would, certainly, violate the Fifth Amendment pertaining to a civil detainee. See Smith, 781 F. App'x. at 597.

41. Under the Eighth Amendment, the Government must provide criminal detainees with basic human needs, including reasonable safety. Helling, 509 U.S. at 32.

42. Under the Due Process Clause of the Fifth Amendment, the Government must provide civil detainees with more than minimal human necessities. See Jones v. Blanas, 393 F.3d 918, 931 (9th Cir. 2004).

43. The Government violates the Eighth Amendment when it confines a criminal detainee in unsafe conditions. See Helling, 509 U.S. at 33.

44. The Government violates the Eighth Amendment when the conditions of a criminal detainee's confinement put the detainee at substantial risk of suffering serious harm and the conditions cause suffering inconsistent with contemporary standards of human decency. See Smith, 781 F. App'x. at 597-598.

45. Plaintiff has a Constitutionally protected right under 8th Amendment for safety and general wellbeing. When the Government takes people into custody and detains them against their will, the Constitution imposes upon the Government a duty to assume responsibility for those detainees' safety and general wellbeing. See Helling v. McKinney, 509 U.S. 25, 32 (1993).

46. The Government cannot be "deliberately indifferent to the exposure of [prisoners] to a serious, communicable disease on the ground that the complaining [prisoners show] no serious current symptoms." Helling, 509 U.S. at 33.

47. The Government is deliberately indifferent when it fails to take reasonable and available measures to abate a known risk. See Gordon v. County of Orange, 888 F.3d 1125, 1124-25 & n. 4 (9th Cir. 2018).

48. "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." Helling, 509 U.S. at 33.

49. The Supreme Court clearly stated that "... the Eighth Amendment protects [prisoners] against sufficiently imminent dangers as well as current unnecessary and wanton infliction of pain and suffering...." Helling, 509 U.S. at 33.

50. The Defendants are deliberately indifferent to plaintiff's health and safety under the 8th Amendment**.** Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement. However, a constitutional violation occurs only where the deprivation alleged is, objectively, "sufficiently serious," and the official has acted with "deliberate indifference" to inmate health or safety. A prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to inmate health or safety only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Farmer v. Brennan, 114 S.Ct. 1970 (1994) Pp. 1976–1986 ,. Parkell v. Danberg (2016) 833 F.3d 313.

51. Plaintiff has a Constitutionally Protected Due Process Right for Safeguards Against Exposure to COVID-19 Disease**.** Alien detainees, who have serious underlying medical conditions, in Immigration and Customs Enforcement (ICE) custody seeking temporary restraining order (TRO) in habeas proceeding to immediately release them from custody, are entitled to release from custody for substantive due process claim of deliberate indifference to their medical needs which predisposed them to higher risk from contracting COVID-19; to ensure constitutionally adequate protection from COVID-19 in light of detainees' underlying health conditions, when there is a high likelihood that detainees are being subjected to unconstitutional conditions of confinement and that risks posed by COVID-19 are imminent, and if detainees are to remain detained they would face a significant risk that they would contract COVID-19. U.S. Const. Amend. 5.  Coronel v. Decker, F.Supp.3d ----, 2020 WL 148727 (March 27, 2020). The Court in Coronel v. Decker held that 1) alien detainees faced a risk of severe, irreparable harm if they contracted COVID-19; 2) alien detainees had serious, unmet medical

needs that made them particularly vulnerable if they contracted COVID-19, as required for claim of violation of substantive due process based on deliberate indifference to serious medical needs; 3) alien detainees demonstrated a likelihood of success on claim government's actions constituted deliberate indifference to their medical needs which predisposed them to higher risk of COVID-19; 4) alien detainees demonstrated a likelihood of success on claim they were entitled under procedural due process to an expeditious bond hearing that considered individualized risk that COVID-19 posed; 5) balance of the equities and public interest weighed in favor of granting TRO releasing alien detainees; 6) alien detainees were entitled to release from custody for substantive due process claims of deliberate indifference to their medical needs; and 7) alien detainees were entitled to release from custody until their bond hearing for procedural due process claim for consideration of their individualized risk that COVID-19 posed.

    52. Government's Deliberate Indifference of Plaintiff's Health Condition Amounts to Punishment because it is not reasonably related to a legitimate nonpunitive Governmental Objective. The Court in Bell v. Wolfish, 99 S. Ct. 1861 (1979) held that in evaluating the constitutionality of conditions or restrictions of pretrial detention that implicates only the protection against deprivation of liberty without due process of law, the proper inquiry is whether those conditions or restrictions amount to punishment of the detainee. Absent a showing of an expressed intent to punish, if a particular condition or restriction is reasonably related to a legitimate nonpunitive governmental objective, it does not, without more, amount to "punishment," but, conversely, if a condition or restriction is arbitrary or purposeless, *521 a court may permissibly infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. In addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of

pretrial detention and dispel any inference that such conditions and restrictions are intended as punishment. Pp. 1872-1875.

53. The Government violates a civil detainee's constitutional rights if a condition of the detainee's confinement places the detainee at substantial risk of suffering serious harm, such as the harm caused by a pandemic. See Smith, 781 F. App'x. at 595.

54. The Government must not be deliberately indifferent to the potential exposure of civil detainees to a serious, communicable disease on the ground that the complaining detainees show no serious current symptoms, or ignore a condition of confinement that is more than very likely to cause a serious illness. See Helling, 509 U.S. at 32

55. Courts have broad power to fashion equitable remedies to address constitutional violations in carceral institutions. Hutto v. Finney, 437 U.S. 678, 687 n.9 (1978). "When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population," Brown v. Plata, 563 U.S. 493, 511 (2011).  "The scope of a district court's equitable powers" in this regard "is broad, for breadth and flexibility are inherent in equitable remedies." Hutto, 437 U.S., at 687, n. 9. Thus, even where "[t]he inquiry involves uncertain predictions regarding the effects of population reductions, as well as difficult determinations regarding the capacity of prison officials to provide adequate care at various population levels," federal courts "have substantial flexibility [in] making these judgments" and crafting an appropriate remedy. Plata, 563 U.S. at 538.

56. Federal courts have repeatedly ordered the release of detained persons when necessary to remedy unconstitutional conditions caused by overcrowding. See, e.g., Plata, 563 U.S. 493; Duran v. Elrod, 713 F.2d 292, 297–98 (7th Cir.1983), cert. denied, 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap); Mobile Cty. Jail Inmates v. Purvis, 581 F. Supp. 222, 224–25 (S.D. Ala. 1984) (concluding that district court properly exercised

remedial powers to order a prison's population reduced to alleviate unconstitutional conditions, and noting other cases); Inmates of the Allegheny Cty. Jail v. Wecht, 565 F. Supp. 1278, 1297 (W.D. Pa. 1983) (order to reduce overcrowding "is within our power to correct the constitutional violations"); Brenneman v. Madigan, 343 F. Supp. 128, 139 (N.D. Cal. 1972) ("If the state cannot obtain the resources to detain persons in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons."); see also Unknown Parties v. Nielsen, CV-15-00250-TUC-DCB, 2020 WL 813774, *1 (D. Az. Feb. 19, 2020) (ordering that DHS release from custody detainees to whom it did not provide a bed, shower, nutritious food, and screening by a medical professional within 48 hours of booking).

**CLAIM FOR RELIEF**

58. Plaintiff reiterates all allegations above and incorporates them by reference as though set forth fully herein. By detaining Plaintiff at Adelanto during the global COVID-19 pandemic without implementing social distancing, Defendants are failing to ensure Plaintiff's reasonable safety, exposing them to a risk of infection from COVID-19 and thus violating his rights under the Fifth Amendment.

59. For the reasons stated above, Defendants' failure to implement social distancing violates Plaintiff's right to reasonable safety in government custody, rendering Defendants' ongoing detention of Plaintiffs in violation of the Due Process Clause.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully ask this Court to take jurisdiction over this actual controversy and:

a. Issue a Writ of Habeas Corpus based on violation of Plaintiff's Due Process rights for continued detention and order Defendants to release the plaintiff for safety and to permit

adequate social distancing or grant any other and further relief that this Court deems just and appropriate

b. Award Plaintiffs his costs and reasonable attorneys' fees in this action under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law.

                                                                                                                                       Respectfully submitted,

Dated: May 12th, 2020                                                   /s/   Soheila Hosseini

                                                                                                        Soheila Hossieni

                                                                                                        Counsel for Plaintiff-Petitioner